UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Marc Woods,

Plaintiff,

v.

Joseph T. Ryerson & Son, Inc. and
United Steelworkers of America,

Defendants.

Civ. No. 00-2619 (JNE/RLE)

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER**

---

Christopher R. Walsh, Esq., Walsh Law Firm, appeared for Plaintiff Marc Woods.

Mark W. Bay, Esq., Peterson, Engberg & Peterson, appeared for Defendant United Steelworkers of America.

---

Marc Woods brought this action against his former employer, Joseph T. Ryerson & Son, Inc. (Ryerson), and his former union, United Steelworkers of America (Union), alleging claims of hostile work environment, race discrimination, and retaliation under 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §§ 2000e to 2000e-17 (2000), and the Minnesota Human Rights Act (MHRA), Minn. Stat. ch. 363A (Supp. 2003). Pursuant to a stipulated settlement agreement, the Court dismissed the claims against Ryerson in an Order dated August 29, 2001. The claims against the Union came before the Court for trial. Based on the evidence received at trial, the Court makes the following Findings of Fact, Conclusions of Law, and Order.

## FINDINGS OF FACT

1. Woods is an African-American male.

2. Ryerson operates a steel-processing facility in Plymouth, Minnesota.

3. The Union is the collective bargaining representative for production, maintenance, and warehouse employees at Ryerson's facility in Plymouth.

4. Woods applied for employment at Ryerson in April 1997. He worked at the Plymouth facility from May 1997 to September 1999. He became a member of the Union after completing a 90-day probationary period at the Plymouth facility.

5. In August 1996, several months before Woods started to work at the Plymouth facility, racially offensive graffiti appeared on a wall of a restroom at the Plymouth facility. Some of the graffiti was scratched into the walls. Ryerson painted over the graffiti before Woods started to work at the Plymouth facility. Although Woods never saw the graffiti, he discerned some scratches through the paint after another employee pointed out the scratches to him. The scratches were the remnants of a swastika and "KKK."

6. Within six months of starting at Ryerson, Woods found a Union pamphlet titled ". . . a humorous look at . . . Your Civil Rights." He found the pamphlet inside a desk where materials for taking orders, such as tape measures and pens, were kept. The pamphlet contains several offensive cartoons that depict interactions between Union members and management and between Union members. The cartoons refer to stereotypes based on race, color, nationality, age, and gender.

7. During Woods's employment at the Plymouth facility, he had heated verbal exchanges with Pete Bach, a Ryerson employee and Union member. The first of these exchanges took place approximately three months after Woods started at Ryerson. The last of these exchanges took place in early February 1999. During some of the exchanges, Bach made racially derogatory comments to Woods. Specifically, Bach referred to Woods as "nigger" and

told Woods that Woods worked at Ryerson only because he was black. In total, Bach referred to Woods's race approximately 12 times.

8. Ryerson suspended Bach in February 1999 because of the racially derogatory comments he made to Woods. Woods and Bach did not work together after Bach's suspension. Bach's employment at Ryerson ended in February 1999.

9. Bach called his supervisor a Mexican dog in Woods's presence.

10. Woods complained to the Union about Bach's racially derogatory comments. The Union responded to Woods's complaints by warning Bach not to use racially offensive language and by telling Bach that he would lose his job if he continued to use such language. The Union also encouraged Woods to bring his complaints about Bach directly to Ryerson.

11. A Ryerson employee and member of the Union made racially derogatory comments about a former mayor of Minneapolis in Woods's presence. Woods did not hear the comments. In the course of apologizing to Woods for making the comments, the employee repeated them. Woods did not complain to Ryerson or to the Union about the comments.

12. Another Ryerson employee and member of the Union made racially derogatory comments about professional athletes in Woods's presence. Woods did not complain to Ryerson or to the Union about the comments.

13. On one occasion, Woods saw racially offensive graffiti at Ryerson. The graffiti appeared on the side of a train car in the morning. The train car remained inside Ryerson's plant for no more than one day. The graffiti made reference to a "dumb black guy." Woods saw the graffiti as he was leaving after his shift. The paint used to make the graffiti was wet when Woods saw it. Woods did not complain to the Union about the graffiti.

14. In February 1999, Woods filed a charge of discrimination with the Minnesota Department of Human Rights (MDHR) and the Equal Employment Opportunity Commission (EEOC), alleging that Ryerson failed to halt Bach's harassment.

15. In April 1999, Ryerson posted a bid for a burner position. Within 72 hours of posting the bid, Ryerson withdrew it. The plant superintendent was at a meeting at Ryerson's Chicago office when a supervisor posted the bid. Upon his return, the plant superintendent directed the supervisor to withdraw the bid because of changes discussed at the Chicago meeting. Woods had bid on the position before the bid's withdrawal. The supervisor did not know who had submitted a bid when he withdrew it. Ryerson did not withdraw the burner bid because of Woods's race or in response to Woods's complaints and charges of discrimination. The Union investigated the bid's withdrawal and concluded that Ryerson had the right to withdraw the bid under the terms of the collective bargaining agreement.

16. In May 1999, Woods filed a charge of discrimination with the MDHR and the EEOC alleging that Ryerson retaliated and discriminated against him by withdrawing the burner bid.

17. In June 1999, Woods successfully bid for the position of Whitney operator. Woods considered the position to be the best one at Ryerson. He held the position until early September 1999 when an African-American employee with greater seniority returned to Ryerson after a leave of absence and, in accordance with seniority provisions of the collective bargaining agreement, "bumped" Woods from the position. Ryerson did not remove Woods from the Whitney position because of his race or because of his complaints and charges of discrimination.

18. Ryerson follows a no-fault attendance policy. Under the policy, accumulation of a certain number of points within a certain time period leads to discipline up to and including discharge.

19. During his employment at Ryerson, Woods accumulated several points under the no-fault attendance policy. As a result, he received attendance notifications, censures, a two-day suspension, and a five-day suspension. Ultimately, Woods was suspended and discharged because he had exceeded 15 points within a 12-month period. Ryerson did not suspend and terminate Woods because of his race or because of his complaints and charges of discrimination. Ryerson properly and accurately assessed the points that led to his suspension and termination.

20. The collective bargaining agreement provides for a five-step grievance procedure that culminates in arbitration. The Union grieved Woods's termination through the first three steps of the grievance procedure. Ryerson rejected the Union's request that Woods be reinstated.

21. Ryerson terminated white employees for accumulating excessive points under the no-fault attendance policy. The Union did not pursue grievances beyond the third step for those employees.

22. In addition to grieving Woods's termination, the Union pursued two other grievances on his behalf. As a result, a written warning for violation of safety rules was removed from Woods's file, and Woods was compensated for overtime that he was not permitted to work in violation of the collective bargaining agreement's seniority provisions. The Union did not refuse to pursue grievances for Woods because of his race or because of his complaints and charges of discrimination.

**CONCLUSIONS OF LAW**

1. The elements of a discrimination claim under Title VII, section 1981, and the MHRA are the same. *Saulsberry v. St. Mary's Univ. of Minn.*, 318 F.3d 862, 866 (8th Cir. 2003).

2. "A labor organization is liable for an employer's discrimination in the workplace if it causes or attempts to cause the employer to discriminate, or if the union 'purposefully acts or refuses to act in a manner which prevents or obstructs a reasonable accommodation by the employer,' or if the union 'pursue[s] a policy of rejecting disparate-treatment grievances' meant to vindicate employee rights protected by Title VII." *Thorn v. Amalgamated Transit Union*, 305 F.3d 826, 832 (8th Cir. 2002) (citations omitted); *see Jacobs v. United Steelworkers of Am.*, 51 Fed. Appx. 184, 185 (8th Cir. 2002) (per curiam).

3. A union does not have an affirmative duty to investigate or to remedy an employer's discrimination. *Thorn*, 305 F.3d at 832; *see EEOC v. Pipefitters Ass'n Local Union 597*, 334 F.3d 656, 660-61 (7th Cir. 2003).[1]

**I. Hostile work environment**

4. To prevail on a claim against an employer for a racially hostile work environment, a plaintiff must show:

> (1) he or she is a member of a protected group, (2) he or she was subjected to unwelcome harassment, (3) the harassment was based on race, (4) the harassment

---

[1] In his post-trial memorandum, Woods cited *EEOC v. Pipefitters Ass'n Local 597*, Nos. 98 C 1601, 98 C 3217, 2002 WL 976618, at *10 (N.D. Ill. 2002), for the proposition that a "federal district court recently recognized that Unions have an affirmative duty to correct a racially hostile work environment for its Union members." Woods failed to acknowledge that the Seventh Circuit Court of Appeals had reversed the Northern District of Illinois several months before he submitted the memorandum. Specifically, the Seventh Circuit concluded: "For all these reasons, we reject the EEOC's contention that unions have an affirmative duty to prevent racial harassment or other forms of discrimination in the workplace." *Pipefitters Ass'n Local Union 597*, 334 F.3d at 660-61.

> affected a term, condition, or privilege of employment, and (5) the employer knew or should have known of the racially discriminatory harassment and failed to take prompt and effective remedial measures to end the harassment.

*Willis v. Henderson*, 262 F.3d 801, 808 (8th Cir. 2001); *see Woodland v. Joseph T. Ryerson & Son, Inc.*, 302 F.3d 839, 843 (8th Cir. 2002) (analyzing claim of hostile work environment under Title VII and MHRA).

5. "In order to be actionable under Title VII, a work environment must have been 'both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'" *Jackson v. Flint Ink N. Am. Corp.*, 370 F.3d 791, 793 (8th Cir. 2004) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)).

6. Whether a reasonable person would find a work environment hostile or abusive turns on all the circumstances including the frequency of the discriminatory conduct, the conduct's severity, whether the conduct is physically threatening or humiliating or a mere offensive utterance, and whether the conduct unreasonably interferes with an employee's work performance. *Id.* (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

7. "Whether the existence of racially derogatory behavior in the workplace constitutes a hostile work environment actionable under Title VII is a function of both the severity and pervasiveness of the offensive conduct, with a high level of severity compensating for a low level of pervasiveness and vice versa." *Id.* at 794.

8. Woods is a member of a protected group and was subjected to racial harassment that he found offensive.

9. Though offensive, the racially derogatory comments made by Bach and other employees, the graffiti observed by Woods, and the Union pamphlet are neither severe nor

pervasive enough to create a hostile work environment. *See id.* at 794-96; *Woodland*, 302 F.3d at 844.

10. The evidence does not establish that the Union caused or attempted to cause Ryerson to subject Woods to a hostile work environment, that the Union acted or refused to act in a manner to remedy the alleged hostile work environment at Ryerson, or that the Union pursued a policy of rejecting grievances to vindicate his right to be free of a hostile work environment at Ryerson. *See Thorn*, 305 F.3d at 832.

**II. Race discrimination**

11. It is an unlawful employment practice for an employer to discharge or to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of the individual's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a).

12. It is an unlawful employment practice for a labor organization "to exclude or to expel from its membership, or to otherwise discriminate against, any individual because of his race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(c)(1). It is also an unlawful employment practice for a labor organization "to cause or attempt to cause an employer to discriminate against an individual in violation of this section." *Id.* § 2000e-2(c)(3).

13. "Except as otherwise provided in [Title VII], an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." *Id.* § 2000e-2(m).

14. The evidence does not establish that Woods's race was a motivating factor in Ryerson's withdrawal of the burner bid. Instead, the evidence establishes that Ryerson withdrew the bid because of changes discussed at a meeting in its Chicago office.

15. The evidence does not establish that Woods's race was a motivating factor in his removal from the Whitney position. Instead, the evidence establishes that Ryerson removed Woods from the Whitney position in accordance with the collective bargaining agreement. Specifically, an employee with more seniority than Woods returned from a leave of absence and "bumped" Woods from the position.

16. The evidence does not establish that Woods's race was a motivating factor in his suspension and discharge. Instead, the evidence establishes that Ryerson suspended and terminated Woods because he had accumulated an excessive number of points under the no-fault attendance policy.

17. The evidence does not establish that the Union caused or attempted to cause Ryerson to discriminate against Woods because of his race, that the Union acted or refused to act in a manner to remedy Ryerson's alleged discrimination, or that the Union pursued a policy of rejecting grievances to vindicate his right to be free from discrimination at Ryerson. *See Thorn*, 305 F.3d at 832.

18. The evidence does not establish that the Union excluded or expelled Woods from membership or otherwise discriminated against him because of his race.

**III. Retaliation**

19. It is an unlawful employment practice for an employer to discriminate against an employee because the employee opposed an unlawful employment practice or filed a charge under Title VII. 42 U.S.C. § 2000e-3(a). It is an unlawful employment practice for a labor

organization to discriminate against a member because the member opposed an unlawful employment practice or filed a charge under Title VII. *Id.*

20. To prevail on a claim of unlawful retaliation by an employer, an employee must establish that he engaged in protected activity, that he experienced an adverse employment action, and that a causal connection exists between the protected activity and the adverse employment action. *Woodland*, 302 F.3d at 845. A causal connection exists if the protected activity was a motivating factor for the adverse employment action. *Warren v. Prejean*, 301 F.3d 893, 901 (8th Cir. 2002).

21. Not everything that makes an employee unhappy constitutes an adverse employment action. *LaCroix v. Sears, Roebuck & Co.*, 240 F.3d 688, 691 (8th Cir. 2001). Instead, an adverse employment action consists of a material employment disadvantage, such as a change in salary, benefits, or responsibilities. *Id.*

22. Woods engaged in protected activity by complaining about racially derogatory comments and filing charges of discrimination.

23. The withdrawal of the burner bid does not constitute an adverse employment action because it did not result in a material employment disadvantage. *See Jacob-Mua v. Veneman*, 289 F.3d 517, 521 (8th Cir. 2002). The evidence does not establish that Woods's protected activity was a motivating factor in the burner bid's withdrawal.

24. Woods's removal from the Whitney position constitutes an adverse employment action. The evidence does not establish that his protected activity was a motivating factor in his removal from the Whitney position. Instead, the evidence establishes that Ryerson removed Woods from the Whitney position in accordance with the collective bargaining agreement.

Specifically, an employee with more seniority than Woods returned from a leave of absence and "bumped" Woods from the position.

25. Woods's suspension and discharge constitute adverse employment actions. The evidence does not establish that his protected activity was a motivating factor in his suspension and discharge. Instead, the evidence establishes that Ryerson suspended and terminated Woods because he had accumulated an excessive number of points under the no-fault attendance policy.

26. The evidence does not establish that the Union caused or attempted to cause Ryerson to retaliate against him, that the Union acted or refused to act in a manner that prevented Ryerson from remedying the alleged retaliation, or that the Union pursued a policy of rejecting grievances to vindicate Woods's right to be free from retaliation at Ryerson. *See Thorn*, 305 F.3d at 832.

27. The evidence does not establish that the Union refused to pursue grievances for Woods because of his complaints and charges of discrimination.

**ORDER**

Based on the evidence received at trial, the Findings of Fact, and the Conclusions of Law, IT IS ORDERED THAT:

1. Woods's claims against the Union contained in his Complaint [Docket No.1] are DISMISSED WITH PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: July 9, 2004

s/Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge